# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

CIVIL CASE NO. 08-210-WOB

STEVEN HELFRICH                                                                                PLAINTIFF

v.                                    **REPORT AND RECOMMENDATION**

LAKESIDE PARK CRESTVIEW HILLS
POLICE AUTHORITY, ET AL.,                                                              DEFENDANTS

* * * * * *

Plaintiff Steven Helfrich (Helfrich) filed this § 1983 action against Lakeside Park Crestview Hills Police Authority (LPCHPA), the City of Lakeside Park,[1] and Officer Miguel Rodriguez (Rodriguez) alleging constitutional violations of false arrest, excessive force, municipal liability under § 1983, and other various state law claims. Before the Court are Plaintiff's Motion for Partial Summary Judgment (R. 34) and Defendants' Motion for Summary Judgment as to all claims (R. 36). This matter has been referred to the undersigned for preparation of a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (R. 42). For the reasons that follow, it is recommended that Plaintiff's dispositive motion be denied and Defendants' dispositive motion be granted in part and denied in part.

## I.     FACTUAL BACKGROUND

The incident at issue occurred in the early morning hours of August 9, 2008, at the Drawbridge Inn in Fort Mitchell, Kentucky. Helfrich, a North Carolina resident, was visiting the area for his cousin's wedding and, like most of the other wedding guests, was staying at the

---

[1]The City of Lakeside Park was voluntarily dismissed as a defendant on July 24, 2009.

Drawbridge Inn. Helfrich and the other guests returned to the Drawbridge Inn after the wedding reception, and the events at issue occurred shortly thereafter.

### A.   Rodriguez's Version of Events

Defendant Rodriguez, a patrolman with the LPCHPA, was dispatched to the Drawbridge Inn as backup for the Fort Mitchell police department, which was already on the scene. (R. 52, at 53). Upon arrival, Rodriguez met with a hotel employee, who then explained to Rodriguez that a large crowd had gathered around the pool area. (*Id.* at 54). The employee stated that hotel security had repeatedly told the crowd to quiet down and eventually asked them to return to their rooms, but the crowd members were not complying. (*Id.*). Rodriguez, in full uniform, then went to the pool area, and, without backup or identifying himself, directed the crowd twice to return to their rooms. (*Id.*).

After the second request, the crowd slowly began to disperse, but at that point, Rodriguez stated that "somebody needed to be made an example of." (*Id.* at 59). Rodriguez heard someone (Helfrich) respond "I'll be that example" or "she'll be an example." (*Id.* at 60). Rodriguez turned and made eye contact with Helfrich. Rodriguez approached him and asked him to return to his room, which Helfrich refused to do, stating that he was not doing anything wrong. (*Id.*). Because Helfrich refused to comply with Rodriguez's request and because he smelled alcohol on Helfrich,[2] Rodriguez proceeded to arrest Helfrich for alcohol intoxication and disorderly conduct. (*Id.*).

According to Rodriguez, Helfrich continued to argue with Rodriguez while Rodriguez was attempting to put handcuffs on him. (*Id.* at 71). He asked why he was being arrested and claimed

---

[2]After returning from the reception, Helfrich and some of the wedding guests spent about an hour at the Drawbridge hotel bar, where he consumed a beer and a mixed drink before the bar closed and he and the other guests moved to the pool area. (R. 53, at 74-75). Counting these two alcoholic beverages, Helfrich consumed five beers and two mixed drinks that day. (*Id.* at 70, 74).

that he had done nothing wrong. (*Id.*). While Rodriguez and Helfrich were struggling, family members surrounded Rodriguez and Helfrich, shouting that Rodriguez could not take Helfrich to jail, and when the bride forced her way between them, Rodriguez was forced to release him. (*Id.* at 77). In an apparent attempt to obtain control of the situation and the crowd, Rodriguez pulled out his taser. (*Id.*). For reasons not entirely clear, Rodriguez's radio was cued, which occurs when a button is pressed on either the shoulder unit or the hip unit. (*Id.* at 76). Rodriguez then requested backup. (*Id.* at 74). Rodriguez continued to tell Helfrich to get on his knees or he would tase him. (*Id.* at 79). Sergeant Loos then entered the area, and Rodriguez was able to "put [Helfrich] down." (*Id.* at 81). Rodriguez testified that when he finished putting the cuffs on Helfrich, Helfrich said "[n]ow I'm going to kick your ass." (*Id.* at 82).

Rodriguez escorted Helfrich down a hallway and out of the hotel to the police cruiser. According to Rodriguez, Helfrich struggled during the walk to the cruiser, trying to push Rodriguez into the walls and doors. (*Id.* at 83). Rodriguez claims that he was walking beside Helfrich, leading him towards the cruiser, and that Helfrich ran him into a glass door that was partially blocking the hallway. (*Id.* at 84). However, once Rodriguez and Helfrich reached the police cruiser, they had a brief, civil conversation, and after loosening the handcuffs at Helfrich's request, Rodriguez attempted to put Helfrich into the back of the cruiser. (*Id.* at 86-88). Rodriguez testified as follows:

> [I] [o]pened the back driver's side passenger door, put my hand on his head, started to explain to him that it was plastic seat, sits lower than most cars. . . .Told him to get in the car. [He said] I'm not getting in the car, why are you arresting me, I didn't do anything wrong.  [I said] get in [the] car, repeated it, told him to get in the car.  Wouldn't get in the car, so I put him in the car. . . .Tucked his head down, which basic math, put his head down, body follows, soon as his head tucked down, he fell in, butt fell on the seat.

(*Id*. at 88-90).

Rodriguez testified that Helfrich then kicked Rodriguez in the leg, and when Rodriguez started to warn him not to do it again, Helfrich "looked at [him], grinded his teeth, and kicked again." (*Id.* at 90). When Helfrich kicked him the second time, Rodriguez reached around Helfrich and drive-stunned him in the back shoulder. (*Id.* at 93). Rodriguez stated during his deposition that the tasing was necessary because Helfrich was "being actively aggressive." (*Id.* at 96).

**B.  Other Officer's Version of Events**

Two Erlanger Police Department officers, Latorsa Humphrey and Todd Lillich testified they witnessed Rodriguez tase Helfrich. Officer Humphrey responded to the call from the Drawbridge Inn, and when she arrived, Rodriguez was by his cruiser with Helfrich. (R. 60, at 9). Officer Humphrey stated that Rodriguez was telling Helfrich to get inside the cruiser, and that "it was a heated discussion." (*Id.* at 13). Officer Humphrey went around to the opposite side of the cruiser to assist in getting Helfrich into the vehicle. (*Id.* at 9). She could not recall whether Helfrich was facing towards or away from Rodriguez, but she stated that once Helfrich was seated in the cruiser, she saw him kick at Rodriguez, although she could not remember whether Helfrich actually made contact with Rodriguez. (*Id.* at 15, 17, 21). She then observed Rodriguez tase Helfrich. (*Id.*).

Upon Officer Lillich's arrival at the hotel, he saw Rodriguez bringing Helfrich out of the main entrance towards his cruiser. (R. 56, at 8). He saw Helfrich continually pulling away from Rodriguez and using profanity. (*Id.*). Then, once they reached the cruiser, Officer Lillich observed Rodriguez repeatedly telling Helfrich, who was facing Rodriguez, to get into the cruiser. (*Id.* at 8, 11). Officer Lillich testified that he had intended to walk to the other side of the cruiser and assist Officer Humphrey in pulling Helfrich into the vehicle. (*Id.*). As he began to walk around the

cruiser, he saw Helfrich, sitting on the edge of the seat, raise his leg and kick Rodriguez. (*Id.* at 12). In response, Officer Lillich saw Rodriguez drive-stun Helfrich. (*Id.*).

### C.    Helfrich's Version of Events

Helfrich testified he returned to the Drawbridge Inn after the wedding reception around 12:45 a.m., and then he and other family members spent the next hour at the hotel bar. (R. 53, at 74-75). When the bar closed around 2:00 a.m., Helfrich and other family members joined approximately forty other wedding guests in the pool area. (*Id.* at 77). Helfrich testified that he did not hear a warning to disperse from hotel security, although one of his family members mentioned they had already been told by the hotel something to that effect. (*Id.* at 79).

Helfrich stated that upon Rodriguez's arrival, Helfrich heard Rodriguez announce that everyone around the pool area needed to leave. (*Id.* at 85). Although some people began to leave, Rodriguez yelled: "who wants to be my first example?" (*Id.*). Helfrich was talking with a group of his family members, including his cousin, who said jokingly to Helfrich, "I'll be his first example." (*Id.* at 87-88). Helfrich then said, "she'll be your first example." Helfrich testified that Rodriguez heard this comment and approached Helfrich, telling him to turn around because he was under arrest. (*Id.* at 89). Helfrich asked Rodriguez why he was being arrested and also asked what he had done wrong. (*Id.*). Rodriguez refused to answer and again asked Helfrich to turn around and put his hands behind his back. (*Id.*). This continued until Rodriguez drew his taser and told Helfrich to get on his knees and put his hands behind his back, or Rodriguez would tase him. (*Id.* at 90). The bride then interceded, stating that Rodriguez would not tase her cousin on her wedding day, and Helfrich voluntarily got down on his knees. (*Id.* at 91). Helfrich did not see any other officers during the course of the arrest. (*Id.* at 98).

Helfrich further testified that after Rodriguez cuffed him, Rodriguez escorted him to the cruiser, and Helfrich complied the entire way. (*Id.* at 99). Helfrich claimed that during the walk to the cruiser, Rodriguez slammed him into glass doors that were partially blocking the hallway, although Helfrich testified he believed the incident occurred because Rodriguez mistakenly thought the doors pushed open. (*Id.* at 102). When they reached the cruiser, Rodriguez frisked Helfrich, and they engaged in a brief, civil conversation. (*Id.* at 110). He does not recall whether Rodriguez loosened his cuffs. (*Id.* at 66). Helfrich describes Rodriguez's attempt to put him into the cruiser as follows:

> I still was asking the question why. I wanted to know why I was getting arrested. He had went ahead – he had went and put his hands on my head to put me in the vehicle, and I – I had my back to him when I was . . . kind of in between the door and the cruiser, and I turned my head to him and I said, I want to know why I'm getting arrested. And he goes, Get in the car. I go, I want to know why I'm going [sic] arrested, and he goes, Get in the car or I'm going to tase you. He had warned me he was going to tase me and he tased me.

(*Id.* at 34).

Helfrich testified that only a few seconds passed between Rodriguez's warning and when the tasing occurred, and he fell face first into the cruiser, hitting his ear on the top part of the door as he fell onto his knees. (*Id.* at 118-119). Helfrich testified that his feet were on the ground, that he got his balance and pushed himself into the cruiser, and at no time did he kick Rodriguez or inadvertently make contact with Rodriguez. (*Id.* at 120).

## D. The Charges

Rodriguez testified that he initially charged Helfrich with disorderly conduct and alcohol intoxication. (R. 52, at 62). Helfrich was ultimately charged with disorderly conduct, alcohol intoxication, resisting arrest, and a felony charge of assault in the third degree based on the alleged

kicking incident. (R. 53, at 55, 57). Helfrich testified that, to his understanding, the alcohol intoxication, resisting arrest, and assault charges were all dismissed. (*Id.* at 56-58). The court clerk's criminal record entries for the state court charges reflect that Helfrich pled guilty to the disorderly conduct charge, that the alcohol intoxication and resisting arrest charges were merged into the disorderly conduct charge, and that the assault third charge was dismissed. (R. 53-2, Ex. 1 to Helfrich deposition).

## II.   STANDARD OF REVIEW

Under the federal rules, summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Wilson v. Karnes*, No. 2:06-cv-392, 2009 WL 467566, at *2 (S.D. Ohio Feb. 24, 2009) (citing *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978)). In reviewing motions for summary judgment, the Court must view all facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). However, the nonmoving party must provide more than a "mere scintilla of evidence;" there must be sufficient evidence on which the jury could reasonably find for the nonmoving party. *Dominguez*, 555 F.3d at 549.

The standard of review is the same for cross-motions of summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material

facts." *Id.* Accordingly, when considering Helfrich's Motion for Partial Summary Judgment, the Court will accept Defendants' version of the facts. Conversely, when analyzing Defendants' Motion for Summary Judgment, the Court will accept Helfrich's version of the facts.

## III. ANALYSIS

### A. Helfrich's § 1983 Claims Against Rodriguez (in his Individual Capacity)

In order to establish a claim under 42 U.S.C. § 1983, Plaintiff Helfrich must establish that: (1) Defendants were acting under color of state law, and (2) Defendants deprived him of rights, privileges or immunities secured by the Constitution or laws of the United States. *Fridley v. Horrighs*, 291 F.3d 867, 871 (6th Cir. 2002). Helfrich asserts that Rodriguez violated his Fourth Amendment rights in two different ways: by Rodriguez arresting him without probable cause, and by Rodriguez using excessive force against him.

#### 1. Helfrich's False Arrest Claim

The constitutional right at issue in a false arrest claim is the Fourth Amendment's right to be free from a warrantless arrest without probable cause. *See Fridley*, 291 F.3d at 871. To establish a § 1983 claim for false arrest, Helfrich must demonstrate a lack of probable cause for his arrest. *Id.* Probable cause exists if there is a "fair probability" that an individual committed or intends to commit a crime. *Id.* at 872.

However, a plaintiff is estopped from asserting a claim that an arresting officer lacked probable cause to arrest him when that plaintiff has entered a guilty plea. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (noting that a § 1983 cause of action does not exist where it would attack the validity of the underlying conviction). Thus, a plaintiff cannot maintain an action that, in

order to be successful, requires proof of insufficient probable cause for an arrest and prosecution of crimes for which a plaintiff was already convicted. *See id.*

In this case, the success of Helfrich's § 1983 false arrest claim requires him to establish a lack of probable cause to support his arrest. *See Fridley*, 291 F.3d at 871. Helfrich's establishment of a lack of probable cause would invalidate his previous conviction for disorderly conduct, an impermissible result under *Heck.* 512 U.S. at 487. Because Helfrich undisputedly pled guilty to the disorderly conduct charge, (R. 53, at 41), he is estopped from now claiming that his constitutional rights were violated because he was falsely arrested under this charge. *See Stoner v. Wills*, No. 3:08-69-DCR, 2009 U.S. Dist. LEXIS 88588, at *6 (E.D. Ky. Sept. 24, 2009) (recognizing that by pleading guilty, the plaintiff could not later argue that probable cause for the arrest did not exist). Although Helfrich urges this Court to disregard the rule under *Heck* and its progeny, the Court is bound by this Supreme Court precedent. Therefore, Helfrich's § 1983 claim of false arrest for disorderly conduct should be dismissed because his state guilty plea to this charge precludes a federal false arrest claim.

Although Helfrich concedes that under the precedent of *Heck* he is precluded from pursuing his false arrest claim, it is not entirely clear from Plaintiff's briefing whether his § 1983 false arrest claim is premised solely on the disorderly conduct charge. (*See* R. 44, at 11). To the extent that the claim is based on this charge, it should be dismissed as discussed above. To the extent that Helfrich's false arrest claim is based on any of the three other charges (alcohol intoxication, resisting arrest, and assault third), the parties have not addressed these charges specifically. There are legal and factual questions to be answered before the appropriateness of summary judgment on false arrest claims based on these charges can be determined. *See Sandul v. Larion*, No. 94-1233, 1995 WL

216919, at *4 (6th Cir. April 11, 1995) (concluding that the lower court erred for failing to address the plaintiff's false arrest claim based on the initial charge of disorderly conduct, reversing and remanding for the trial court to do so, while affirming the district court's dismissal of plaintiff's § 1983 claim of false arrest for attempted felonious assault based upon his plea of nolo contendere to this charge in state court).

If the false arrest claim is based on either the resisting arrest charge or the alcohol intoxication charge, a legal question exists as to whether Helfrich also pled guilty to these charges pursuant to the "merger" of these charges with the disorderly conduct charge, or whether Helfrich stipulated to probable cause in the state proceedings, or whether the conduct at issue for these charges overlaps that for which Helfrich entered his disorderly conduct guilty plea to such extent that false arrest for these charges is also precluded under *Heck*. Furthermore, if the false arrest claim is based on the assault third charge, that charge was undisputedly dismissed, and so *Heck* would not apply. Moreover, a factual question exists as to whether Rodriguez reasonably believed that he had probable cause to arrest Helfrich for that violation because that charge arises from Helfrich allegedly kicking Rodriguez. Because the parties dispute whether the kicking incident occurred, there is a genuine issue of material fact at to whether probable cause for that charge existed. Thus, to the extent that the claim may be based on one of these other three charges, Defendants' summary judgment motion should be denied because Defendants did not directly address how a false arrest claim premised upon any of these other charges is also precluded. (*See* R. 36, at 13) (addressing only the disorderly conduct charge in relation to the false arrest claim).[3]

---

[3]In their Reply, Defendants urge the Court to reject Plaintiff's argument that *Heck* should not be applied to his false arrest claim because Rodriguez "deliberately overcharged [him] then amended down." Defendants so urge by citing to *Dier v. City of Prestonberg,* 480 F. Supp. 2d 929 (E.D. Ky. 2007), a case

## 2.     Helfrich's Excessive Force Claim

Next, Helfrich also asserts a § 1983 claim on the basis that Rodriguez used excessive force following his arrest.  At this stage, the sole incident being pursued is that Rodriguez's use of the taser to force Helfrich into the cruiser constituted excessive force.[4]  Helfrich's excessive force claim asserts a violation of the Fourth Amendment right to be free from unreasonable seizures, which is analyzed under an objective reasonableness test.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  This inquiry also affects the applicability of Defendants' qualified immunity defense, as the first prong under the qualified immunity inquiry is whether a plaintiff's constitutional right was violated.  *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004).  As outlined by the Supreme Court, the existence of a constitutional violation is a totality of the circumstances test, but three factors are significant.  *Graham*, 490 U.S. at 396.  These factors are: (1) the severity of the crime; (2) the threat of immediate

---

from another division of this court.  *Dier* did not involve an allegation of deliberate overcharging, or the argument that *Heck* should not apply because of deliberate overcharging.  Defendants may have cited *Dier* as their indirect response to any argument by Helfrich that his false arrest claim stems from more than one charge, because *Dier* also involved multiple charges arising from the same event or circumstance.  *Id.* at 936-37.  As the court there noted, pursuant to application of *Heck*, "Dier is estopped from denying conduct that constitutes the essential elements required for him to be convicted of those [other charged] offenses."  *Id.* at 936.  "Therefore, as a matter of law, Dier is collaterally estopped from maintaining a claim that, in order to prevail, requires proof of insufficient probable cause to arrest and prosecute Dier for the crimes for which he was convicted."  *Id.* at 937.  As discussed above, the same holds true here, but the parties have not sufficiently briefed these charges, in particular the assault third charge, to allow the Court to determine whether summary judgment for being falsely arrested for these other charges is warranted in the instant matter.

[4] Helfrich's Amended Complaint also alleged that Rodriguez slammed Helfrich into a glass door while escorting him to the cruiser.  (R. 4, at 4).  However, a review of Helfrich's briefing reveals that this claim has been abandoned.  Although Helfrich recites his version of the event in his facts, he makes no arguments regarding it in either his supporting brief or his responding brief, even though Defendants argue this point in their brief.  (*See* R. 36, at 14).  Accordingly, to the extent that Helfrich pleaded that the incident involving the glass doors constituted excessive force, the claim has been abandoned for purposes of summary judgment and will not be addressed.

danger to the officers or the community; and (3) whether the suspect was attempting to flee or evade control. *Id*.

When weighing the *Graham* factors, the Court should give deference to the officers' actions, recognizing that decisions are usually made quickly and in dangerous situations. *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). As such, it is important for the Court to refrain from judging the reasonableness of the officer's actions through 20/20 hindsight, and to consider the actions through the eyes of an officer on the scene. *Graham*, 490 U.S. at 396.

In engaging in the totality of the circumstances inquiry, first a court must consider the factual situation at the time the alleged excessive force was used, because the reasonableness of an officer's conduct depends on the situation as faced by him. *See Kijowski v. City of Niles*, No. 09-3764, 2010 WL 1378601, at *4 (6th Cir. April 8, 2010). As mentioned above, this claim is before the Court on cross-motions for summary judgment. Consideration of Helfrich's Motion for Partial Summary Judgment on this claim follows; consideration of Defendants' motion on this claim will be taken up under the first prong of the qualified immunity analysis.

In analyzing Helfrich's motion, the Court must view the facts in a light most favorable to Rodriguez, and thus the Court will accept his version of the facts as true. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587-88. Therefore, the question becomes whether Rodriguez acted in an objectively reasonable manner when he tased Helfrich, assuming Helfrich verbally resisted Rodriguez's instruction to enter the cruiser, was arguing and struggling with him, and kicked him.

As to the first factor, severity of the crime, Helfrich was initially charged with disorderly conduct and alcohol intoxication. (R. 52, at 62). Disorderly conduct and alcohol intoxication are not, on their face, serious enough to warrant use of significant force. *See Harris v. City of*

*Circleville*, 583 F.3d 356, 366 (6th Cir. 2009) (noting that DUI, speeding, and failure to appear in court were not violent crimes and were not particularly serious); *McCline v. Roose*, Case No. 1:07-cv-0545, 2009 U.S. Dist. LEXIS, at *23 (N.D. Ohio Mar. 6, 2009) (recognizing that disorderly conduct and resisting arrest are "not particularly severe"). While Defendants do not address the conduct that served as the basis for the resisting arrest charge, they do note that the assault third charge arose from Helfrich allegedly kicking Rodriguez. Under Kentucky law, this charge is serious. *See Covington v. Commonwealth*, 849 S.W.2d 560, 563 (Ky. Ct. App. 1992). Accepting Rodriguez's version of the facts as true, his decision to use the taser was directly in response to the behavior supporting this charge, and thus he did consider this "serious" charge when determining the level of force to use. Accordingly, one of the charges in this situation, assault third, is serious.

The second factor is the immediate danger posed by a plaintiff to the officers and others in the vicinity. When considering the facts in a light most favorable to Rodriguez, Helfrich was potentially a danger to the officers because he was able to and was, in fact, kicking at Rodriguez. *See Kijowski*, 2010 WL 1378601, at *5 (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)) (noting that use of a taser is justified when the plaintiff poses a threat by kicking, biting, and starting fights with the officers). Although Helfrich was handcuffed, he was a danger because he had tried to run Rodriguez into walls and doors and had eventually kicked him. (R. 52-1, at 4, 10, 13). Therefore, Helfrich was an immediate threat to Rodriguez, warranting the use of force.

The final factor is whether Helfrich was actively resisting or evading by flight. When accepting Defendants' version of the facts as true, it is reasonable to believe that Helfrich was actively resisting. Rodriguez and Lillich both testified that Helfrich was pulling away and struggling against Rodriguez's control as they walked towards the cruiser. Additionally, both Humphrey and

Lillich heard Helfrich arguing and refusing to comply with Rodriguez's requests to enter the car. Lillich also heard Helfrich using profanity. Finally, Rodriguez and Lillich both testified that Helfrich kicked Rodriguez. Considering these facts, Helfrich was actively resisting, and thus Rodriguez's use of the taser was reasonable. *See Kijowski*, 2010 WL 1378601, at *5 (noting that "active resistance" or some other compelling justification warranted the use of force); *McCline*, 2009 U.S. Dist. LEXIS 17353, at *26 (recognizing that use of a taser on an individual who was still actively resisting was reasonable). Because the parties dispute whether the kicking occurred, a genuine issue of material fact remains, and Plaintiff Helfrich is not entitled to judgment as a matter of law. Accordingly, his Motion for Summary Judgment on the excessive force claim should be denied.

## B. Defendant's Qualified Immunity Defense

Defendants argue they are entitled to summary judgment on the basis of qualified immunity. "Government officials acting in their official capacities are entitled to qualified immunity for those discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Feathers v. Aey,* 319 F.3d 843, 847 (6th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense to be asserted during litigation. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). Instead, it acts as an entitlement not to even stand trial or defend against the claim. *Id.*

The inquiry into whether a government official is entitled to qualified immunity includes: (1) whether the plaintiff has established facts that demonstrate that the defendant's conduct violated a constitutionally protected right; and if so (2) whether that right was clearly established such that at the time the act was committed, a reasonable official would have understood that his behavior violated that right. *Pearson v. Callahan,* 129 S. Ct. 808, 815 (2009); *Jerauld ex rel. Robinson v.*

*Carl*, No. 06-05-WOB, 2009 WL 74781, at *6 (E.D. Ky. March 19, 2009). The second prong of the qualified immunity inquiry focuses on whether the official had notice that his conduct was unlawful, and thus, the reasonableness of his conduct is determined by the state of the law at the time of the conduct. *See Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005). There are two ways to show that the official should have known that he was violating a clearly established right. *Id.* First, the constitutional violation was sufficiently "obvious" that the official should have known his conduct violated general constitutional standards. Second, the violation of the right may be shown by the official's failure to adhere to a "particularized" body of law that governs the relevant issue. *Id.*

### 1.     Whether a Constitutional Violation Occurred

Determining the appropriateness of summary judgment in Defendants' favor on the excessive force claim requires accepting Helfrich's version of the facts as true when analyzing the *Graham* factors. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587-88. This same examination is required under the first prong of the qualified immunity analysis to determine whether a constitutional violation has occurred. Therefore, the question becomes whether Rodriguez acted in an objectively reasonable manner when he tased Helfrich, assuming Helfrich failed to promptly comply with Rodriguez's instruction to get into the cruiser, but otherwise did not verbalize he would not get in the cruiser, was not physically resisting, and did not kick him.

The first *Graham* factor focuses on the severity of the crime. Here, as stated above, Helfrich was initially charged with disorderly conduct and alcohol intoxication, which are not particularly serious crimes.[5] *See Harris*, 583 F.3d at 366; *McCline*, 2009 U.S. Dist. LEXIS 17353, at *23.

_____

[5]Defendants argue that Helfrich was charged with assault third, a serious crime warranting use of force. (R. 45, at 7). But accepting Helfrich's version of the facts, the kicking did not even occur, there was no legal basis for the charge, and it should not be considered when analyzing the severity of the charges.

The second factor is the immediate danger posed by the plaintiff to the officers and others in the vicinity. Accepting Helfrich's version of the facts, he was not a danger to the officers or to others. He was handcuffed and nonviolent. At most, he calmly questioned Rodriguez about the reason for his arrest and, according to Helfrich, this occurred just after he and Rodriguez had a brief civil conversation at the cruiser about Helfrich's employment, and Rodriguez testified this was also when he loosened the handcuffs. Helfrich's questions did not pose a danger to either the officers or to the public, as they had left the pool area and no private citizens were nearby. Therefore, Helfrich was not an immediate threat to others such to warrant use of force.

The final factor is whether Helfrich was actively resisting or evading by flight. While the parties factually disagree concerning the level of resistance Helfrich displayed or voiced, the parties do agree that when Rodriguez instructed Helfrich to get into the squad car, he did not comply. (R. 53-1, at 34-38).

It is well-settled generally within the Sixth Circuit that the gratuitous use of force on a suspect who has already been subdued and is in handcuffs is unconstitutional. *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988). Furthermore, the Sixth Circuit has recognized that use of non-lethal force on a handcuffed suspect who no longer poses a safety threat, flight risk, or is not resisting constitutes excessive force. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (concluding that using pepper spray on an individual who had stopped resisting and posed no flight risk was an unreasonable use of force); *see also McDowell*, 863 F.2d at 1307; *McCline*, 2009 U.S. Dist. LEXIS 17353, at *22-23 (citing cases).

A review of the case law reveals a difference in the manner in which courts treat a resisting individual and a noncompliant individual. *Compare Kijowski*, 2010 WL 1378601, at *5 (noting that "[w]ithout active resistance" or some other compelling justification, use of a taser on a "non-resistant person is unreasonable"); *Champion*, 380 F.3d at 901 (recognizing that proper consideration of the *Graham* factors includes whether the suspect is *actively resisting*) (emphasis added); *McCline*, 2009 U.S. Dist. LEXIS 17353, at *25-27 (distinguishing the use of a taser in situations where the suspect was actively resisting and only verbally noncompliant); *Michaels v. Vermillion*, 539 F. Supp. 2d 975, 986-87 (N.D. Ohio 2008) (recognizing the Sixth Circuit precedent that use of a taser on an individual "who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force"); *Carter v. Colerain Township*, No. 105-cv-163, 2007 WL 869272, at *16 (S.D. Ohio Mar. 20, 2007) (concluding that tasing an unarmed, unhandcuffed individual who was not actively resisting the officers was unreasonable as a matter of law); *with Haney v. Dunlap*, Case No. 1:08-cv-1782, 2009 U.S. Dist. LEXIS 25215, at *7 (N.D. Ohio 2009) (determining that use of a taser to subdue a suspect who continued to struggle after being tackled was reasonable); *Wylie v. Overby*, Case No. 05-cv-71945-DT, 2006 U.S. Dist. LEXIS 29845, at *27 (E.D. Mich. April 14, 2006) (acknowledging that the plaintiff's "assaultive acts in resisting arrest" justified the officer's use of a taser); *Devoe v. Rebant*, Case No. 05-71863, 2006 U.S. Dist. LEXIS 5326, at *5 (E.D. Mich. Feb. 13, 2006) (noting that plaintiff-police officer was tased after being combative, hostile and expressly refusing to enter the squad car after eleven requests, stating "[I] ain't sitting nowhere"). Accordingly, accepting Helfrich's version of the facts, a jury could find that Rodriguez's tasing of Helfrich while Helfrich was handcuffed but was not physically resisting nor verbalizing a refusal to

obey, constituted an unreasonable use of force and thus a violation of his constitutional rights. *See McCline*, 2009 U.S. Dist. LEXIS 17353, at *24; *Carter*, 2007 WL 869272, at *16.

The cases that Defendants rely upon to demonstrate that no constitutional violation occurred are distinguishable. In *Devoe*, the defendant asked the plaintiff to enter the cruiser eleven times and the plaintiff was extremely belligerent, blatantly uncooperative, and hostile. *Devoe*, 2006 U.S. Dist. LEXIS 5326, at *22-23. In *Magee v. City of Daphne*, Civil No. 05-0633-WS-M, 2006 WL 3791971 (S.D. Ala. Dec. 20, 2006), and *Schumacher v. Halverson*, 467 F. Supp. 2d 939 (D. Minn. 2006), the plaintiffs were not handcuffed, had not yet been arrested, and whether they were armed was unknown, making the situation inherently dangerous. *See Magee*, 2006 WL 3791971, at *4; *Schumacher*, 467 F. Supp. 2d at 951-52. In the case at hand, Helfrich was handcuffed, had already been arrested, was unarmed, and according to Helfrich, was at most calmly questioning why he was being arrested. In *Alexander*, the plaintiff refused to obey the officers' orders to enter the patrol car, had shown a belligerent attitude and had threatened the officers. *Alexander v. City of Shelby Twp*., No. 07-cv-14741, 2009 U.S. Dist. LEXIS 93960, at *2, 6 (E.D. Mich. Oct. 8, 2009). The court concluded that use of the taser was reasonable in these circumstances, as "an objectively reasonable officer under the circumstances could have understood Plaintiff's failure to get into the police car as *resistance* to police commands." *See id.* at *8, n.3 (emphasis added). In the instant case, Helfrich did not comply immediately with Rodriguez's instruction to enter the cruiser, instead turning his head to ask Rodriguez why he was being arrested. This circumstance evidenced Helfrich was noncompliant, rather than resistant. He was not physically resistive, nor verbally threatening or resistant. Indeed, describing his behavior as noncompliant is based only upon his failure to

immediately obey the instruction to enter the cruiser. He did not expressly state that he would not get into the car. Therefore, Defendants' cases are factually distinct from the case at bar.

Because there is a genuine issue of material fact regarding the underlying circumstances, and the resolution of these circumstances is required to determine whether Rodriguez's actions were reasonable, the Court cannot decide whether Helfrich's rights were violated as a matter of law.[6] Therefore, Defendants' Motion for Summary Judgment as to the excessive force claim should be denied.

## 2.     The Law Is Clearly Established

Rodriguez may still be entitled to qualified immunity on the excessive force claim, however, unless the right he violated was clearly established. *Brosseau*, 543 U.S. at 198. The right at issue must be clearly established such that a reasonable officer would understand that his actions violated the right at issue. *See Feathers*, 319 F.3d at 848.

Determining whether the right at issue was clearly established involves analysis of precedent to determine whether it "squarely governs the case" before the court. *Brousseau*, 543 U.S. at 201. However, "notable factual distinctions between the precedents relied on" and the facts of the case at issue can exist, "so long as the prior decisions give reasonable warning that the conduct then at issue violated constitutional rights." *Champion*, 380 F.3d at 902 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)); *see also Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (noting that the right must be defined so that a reasonable official would be on notice that his actions were

---

[6]Although Helfrich argues that Rodriguez violated LPCHPA's use of force policy, and that this violation supports his § 1983 claim, this argument fails. The Supreme Court has stated that violating a statutory or administrative policy does not defeat the defense of qualified immunity. *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

unconstitutional). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers*, 319 F.3d at 848. If the standards governing the constitutional right depend on the facts, it is important to search for factually similar cases that predate the conduct. *Lyons*, 417 F.3d at 572. If the case law is unclear, then the right is not clearly established. *See Brosseau*, 543 U.S. at 201 (noting that the diverging conclusions from the cases before the court demonstrated that the officer's conduct was by no means a clear violation of the Fourth Amendment). Finally, the burden is on the plaintiff to establish that the allegedly violated right was clearly established. *See Cope v. Heltsley,* 128 F.3d 452, 459 (6th Cir.1997); *Perach v. Lee*, No. 08-13754, 2009 U.S. Dist. LEXIS 90460, at *22 (E.D. Mich. Sept. 30, 2009).

The Sixth Circuit has repeatedly held that the use of force on a suspect who has already been subdued and is in handcuffs is gratuitous and therefore unconstitutional. *Phelps*, 286 F.3d at 301; *McDowell*, 863 F.2d at 1307. More applicable to the facts of this case, the Sixth Circuit has recognized that use of non-lethal force on a handcuffed suspect who no longer poses a safety threat, flight risk, and is not resisting constitutes excessive force. *Wysong v. City of Heath*, No. 06-4433, 2008 WL 185798, at *7-8 (6th Cir. Jan. 22, 2008) (recognizing that use of force was reasonable if the defendant was physically resisting, but if he were not, use of physical force was excessive); *Bultema v. Benzie County*, No. 04-1772, 2005 WL 1993429, at *6 (6th Cir. Aug. 17, 2005) (noting that use of pepper spray after a subject had stopped resisting constituted excessive force); *Champion*, 380 F.3d at 901 (concluding that using pepper spray on an individual who had stopped resisting and posed no flight risk was an unreasonable use of force).

A general review of Sixth Circuit district court cases involving tasers as the specific form of force employed reveals a number of cases, some concluding that the use of a taser was reasonable, others concluding that it was not. *See, e.g., Michaels*, 539 F. Supp. 2d at 986-87 (concluding that whether tasing a handcuffed individual for verbal noncompliance was reasonable was a question of fact for the jury); *McGee v. City of Cincinnati Police Dept.*, No. 1:06-cv-726, 2007 WL 1169374, at *4-5, (S.D. Ohio April 18, 2007) (concluding that tasing a suspect stopped for fairly serious criminal activity who had initially attempted to evade officers and who, once stopped, failed to comply with instruction to get down on the ground while another officer was shouting "check him for a gun" was not so unreasonable as to amount to excessive force); *Carter*, 2007 WL 869272, at *16 (finding that "as a matter of law it was clearly established that the use of a taser" against plaintiffs who were not actively resisting and were unarmed would constitute excessive force); *Wylie*, 2006 U.S. Dist. LEXIS 29845, at *25-26 (recognizing that use of a taser to subdue an individual who had assaulted an officer and resisted arrest was a reasonable use of force); *Devoe,* 2006 U.S. Dist. LEXIS 5326, at *5 (determining that tasing an individual for resisting an officer was not unreasonable). Defendants urge that because these decision vary, the law involving tasers is not clearly established.

Careful examination of factually similar cases involving tasers as the form of force used reflects that use of a taser after the individual is handcuffed, no longer poses a safety threat or flight risk, and is not resisting constitutes excessive force. *See Carter*, 2007 WL 869272, at *16 (finding that "as a matter of law it was clearly established that the use of a taser" against plaintiffs who were not actively resisting and were unarmed would constitute excessive force). The cases concluding that use of a taser was reasonable are factually distinguishable from the case at hand. Specifically,

21

in those cases, the subject was either not handcuffed, *see McGee*, 2007 WL 1169374, at *4-5; *Wylie*, 2006 U.S. Dist. LEXIS 29845, at *25-26, or was verbally combative to the point of being threatening and resisting, *see Devoe*, 2006 U.S. Dist. LEXIS 5326.

Therefore, although there may be no Sixth Circuit authority squarely on all fours with the facts surrounding the tasing as described by Helfrich, Sixth Circuit case law demonstrates that use of *non-lethal* force, which would include a taser, on a handcuffed suspect who no longer poses a safety threat, is not a flight risk, and is not resisting constitutes excessive force. *See Wysong*, 2008 WL 185798, at *7-8; *Bultema*, 2005 WL 1993429, at *6; *Champion*, 380 F.3d at 901. The fact that these cases did not involve a taser as the weapon employed is irrelevant, as the holdings still give an officer reasonable notice that use of non-lethal force in such circumstances is unreasonable. *See Champion*, 380 F.3d at 902 (recognizing that "notable factual distinctions between the precedents relied on" and the case at bar can exist, "so long as the prior decisions give reasonable warning that the conduct then at issue violated constitutional rights"); *see also Perach*, 2009 U.S. Dist. LEXIS 90460, at *21-22 (noting the parallels between pepper spray and tasers and applying the pepper spray case law to deployment of a taser). Furthermore, cases from courts within the Sixth Circuit, as discussed above, demonstrate that under the facts at issue in this case, the law is clearly established.

Additionally, the authority Defendants rely upon in support of their argument that the law is not clearly established is distinguishable. First, Defendants argue that Rodriguez's use of force was reasonable because it prevented the situation from escalating into a more dangerous situation. (*See* R. 36, at 19). However, Defendants cite only one case to demonstrate that the use of a taser to avoid a dangerous situation is not unreasonable, *Caldwell*, 968 F.2d at 595. That case involved the alleged

violation of a prison inmate's Eighth Amendment right, rather than the Fourth Amendment right at issue here, and it is very different factually. *See Caldwell*, 968 F.2d at 599.

Next, Defendants rely on *Alexander*, a case from the Eastern District of Michigan, wherein the court concluded, and the plaintiff conceded, that the law was not clearly established. However, this case is not helpful in the Court's analysis, as it fails to reference any law or use any reasoning to explain its conclusion that the "law governing the use of a taser to gain an arrestee's compliance with police officer commands is . . . hazy." *Alexander*, 2009 U.S. Dist. LEXIS 93960, at *9. Furthermore, this case was decided after the use of force incident in the instant matter, and therefore it cannot be used in determining the state of the law at the time. *See Lyons*, 417 F.3d at 579 (noting that the reasonableness of an officer's conduct is determined by the state of the law at the time the conduct occurred). While the *Alexander* court describes the law as hazy, there is no actual analysis of the legal decisions to explain this conclusion, likely because the plaintiff conceded that the law was not clearly established. *See Feathers*, 319 F.3d at 848 (noting that "an action's unlawfulness can be apparent from ... the general reasoning that a court employs"). Thus, *Alexander* is neither authoritative nor persuasive in determining whether the law was clearly established in August 2008 that use of a taser to command compliance by an arrestee who is not otherwise physically or verbally resistive is excessive.

Conversely, in *McCline*, a case factually similar to the one at hand, the court cited several cases in its analysis to conclude that Sixth Circuit precedent provides an officer reasonable notice that use of a taser on a handcuffed, non-resistant individual constituted excessive force. *See McCline*, 2009 U.S. Dist. LEXIS 17353, at 32 (denying qualified immunity to an officer who had tased a handcuffed suspect for refusing to exit the police cruiser). While this case also post-dates

the incident at hand, and therefore does not provide Rodriguez with direct notice, the case carefully sets forth the analytical background against which the Court must compare Rodriguez's actions, as the cases cited therein and relied upon by that court in determining whether the law was clearly established predated August 2008 and are also relevant to the qualified immunity analysis here. Therefore, the Court concludes that the law at the time of the incident governing the use of force on a handcuffed, non-resistant subject was clearly established, and Defendants' qualified immunity defense must fail.

### C. Helfrich's § 1983 Claim Against the LPCHPA and Rodriguez (in his Official Capacity)

A municipality cannot be held responsible for the alleged deprivation of constitutional rights unless the plaintiff can establish a direct causal link between a policy or custom and the alleged deprivation. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).[7] The policy or custom "must be the 'moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). A municipality may not be held liable for a § 1983 claim on the theory of respondeat superior. *Monell*, 436 U.S. at 694. Thus, the plaintiff must identify a policy or custom that was the motivating factor behind the constitutional violation and arose as a result of deliberate indifference to those rights. *Doe v. Clairborne County*, 103 F.3d 495, 508 (6th Cir. 1996). To constitute a "moving force" behind the plaintiff's injuries, the policy or custom must be closely related to the ultimate injury. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).

---

[7]Municipal liability under § 1983 based upon a theory of respondeat superior is not permitted, *see Monell,* 436 U.S. at 694, and so the LPCHPA cannot be vicariously liable as Rodriguez's employer.

Under a failure to train or supervise theory as argued by the parties here, Helfrich must establish that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *See Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)). To establish the high standard of deliberate indifference, Helfrich can demonstrate that the LPCHPA either failed to train its officers in light of foreseeable consequences, or failed to respond to repeated complaints of constitutional violations by its officers. *See id.* at 700-01.

In support of his claim, Helfrich points out that there were two tasing incidents by Rodriguez, and alleges that because they occurred within only a few days of each other, Rodriguez was inadequately supervised.[8] Helfrich further alleges that Sergeant Bihl's failure to record the statements of witnesses during his use-of-force investigation, the fact that he has never concluded, in any of his investigations, that an officer had used excessive force, and the fact that Sergeant Schutte failed to recognize that significant discrepancies between a suspect's account of events and an officer's account have occurred, all demonstrate a deliberate indifference in the training and supervising of the LPCHPA's officers. However, Helfrich fails to cite *any* cases in support of his arguments that such facts (even if true) constitute deliberate indifference.

To the extent that Helfrich argues that Rodriguez was inadequately trained to demonstrate deliberate indifference, this allegation must fail, as the facts show otherwise. First, Rodriguez was trained in both the aspects of arrest and use of force. (*See* R. 52, at 13-14). He successfully

---

[8]On August 7, 2008, just two days before the incident involving Helfrich, Rodriguez tased Kaleb Clark, a juvenile fleeing from police at a party. (R. 44-1, at 1). Clark failed to obey police orders to stop, and ultimately, Rodriguez tased Clark. (*Id.*). Clark never filed a complaint or lawsuit regarding the incident.

completed a training course conducted by the Kentucky Department of Justice. (R. 52-1, at 128-29). Additional training was also received after he started with the LPCHPA, and one segment of this training focused on the use of a taser device. (R. 52, at 13-14). Accordingly, the record does not reflect that the training received was inadequate for the tasks performed.

Additionally, Helfrich cannot establish deliberate indifference by showing that the LPCHPA failed to respond to complaints of constitutional violations. First, the LPCHPA had a policy of investigating any incident in which an officer used force, including a taser. This policy required that a sergeant would immediately investigate the incident, interview all witnesses or participants, and determine whether excessive force had been used. Here, in accordance with the LPCHPA policy, Sergeant Bihl was contacted after Rodriguez discharged the taser, and he conducted a use of force investigation. (R. 59, at 19). The sergeant arrived and talked with Rodriguez, Helfrich, the other officers, and several other witnesses. (*Id.* at 24, 45). Sergeant Bihl did not record the interviews, although he could have used the in-car recording equipment during his interview with Helfrich. (*Id.* at 50). Following the investigation, Sergeant Bihl then drafted a report, which he submitted to his direct supervisor and the captain of the LPCHPA, per the department policy. In his report regarding the Helfrich incident, the sergeant concluded that the force used was not excessive. (*Id.* at 60-61). He further noted that Rodriguez could have handled the situation better, and proper judgment may have avoided the use of force. (*Id.*). Accordingly, LPCHPA had a policy in place, and it was utilized by the officers.

Second, the only alleged constitutional violation reported to the LPCHPA is the one at issue in this case. Although Helfrich points to the incident involving Kaleb Clark as another incident in which Rodriguez allegedly violated an individual's constitutional rights, Clark never filed a

complaint or action against either Rodriguez, the LPCHPA, or the City. Therefore, there were at most two incidents alleging excessive force, but only one complaint was actually made against the LPCHPA. Furthermore, the incidents occurred so closely in time that the LPCHPA did not have significant time to respond between incidents. Even considering the close proximity in time, in accordance with policy, Sergeant Bihl still conducted an investigation into both incidents and concluded that the use of force was not excessive in either case. The fact that the investigations occurred demonstrates adequate supervision. Therefore, Helfrich cannot establish that the LPCHPA has failed to respond to complaints of constitutional violations.

While Helfrich argues that the investigations were improperly conducted, the record does not support this claim. Helfrich claims that Sergeant Bihl's failure to record interviews was improper. However, recording is not required by LPCHPA policy or by any other law or mandatory policy offered by Helfrich. Furthermore, Helfrich argues that Sergeant Bihl's conclusions; namely, that he has never concluded that the force used was excessive, demonstrate a deliberate indifference. But Helfrich's mere challenge to the conclusions of the investigations recognizes that a policy to investigate did, in fact, exist. Therefore, the LPCHPA policy required investigation after each use of force, and the fact that no use of force was determined to be excessive is not an example of deliberate indifference.

Additionally, Helfrich points to only two incidents to establish an alleged pattern of ignoring incidents of force and performing rubber stamp investigations, and technically, only one was reported to the LPCHPA. Two complaints are insufficient to establish a "clear and persistent pattern" of unconstitutional conduct. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (finding that forty-five lawsuits claiming excessive force did not demonstrate a pattern

or practice because no comparison as to a "normal" number of complaints was provided); *Ellis*, 455 F.3d at 701 (noting that two incidents over two years did not put the District on notice of a problem). Here, specifying only two incidents which occurred in a short period of time does not establish a pattern without showing that two incidents are, in fact, excessive, which Helfrich has failed to do. Furthermore, and as Helfrich admits, since LPCHPA began using tasers in 2003, there have been only a few incidents in which a taser was discharged. The fact that two occurred within a short period does not establish the excessiveness required to demonstrate deliberate indifference on the part of the LPCHPA, especially considering that the LPCHPA had an investigative policy that was, in fact, utilized. Therefore, Helfrich fails to establish that the LPCHPA was deliberately indifferent in training or supervising its employees, and Defendant's Motion for Summary Judgment as to this claim should be granted.

### D. Helfrich's State Law Claims

In his Amended Complaint, Helfrich asserted several state law claims against both Rodriguez and the LPCHPA. (R. 4). Helfrich asserted claims against Rodriguez for assault, battery, negligent infliction of emotional distress, and intentional infliction of emotional distress. Against the LPCHPA, he asserted a negligent supervision and training claim, as well as a count for respondeat superior liability.

#### 1. Claims Against Rodriguez in his Individual Capacity

##### a. Assault and Battery Claims

Helfrich's motion purports to move for summary judgment as to the assault and battery state law claims, but he does not reply to Defendants' responsive argument on these claims. Rather, his Reply to Defendants' Response appears to abandon seeking partial summary judgment as to these

claims. (*See* R. 46, at 12) (noting in Reply that, other than the excessive force claim, "[a]ll Plaintiff's remaining claims should proceed to jury for a Trial as to Liability and Damages").

Defendants also moved for summary judgment as to these claims. For reasons already discussed above, construing the facts in a light most favorable to Helfrich could lead a jury to reasonably conclude that Rodriguez violated not only Helfrich's constitutional rights, but state law as well. Furthermore, while the Defendants set forth the elements of these state law claims, they primarily rely on the statutory defense provided in K.R.S. § 503.090 in support of summary judgment. The applicability of that defense, however, cannot be determined until the underlying facts are settled. Accordingly, because a genuine issue of material fact exists as to the underlying facts, summary judgment in Defendants' favor is inappropriate at this time as to the assault and battery claims.

### b. Emotional Distress Claims

Defendants move for summary judgment as to both emotional distress claims. In Helfrich's Amended Complaint he merely alleges "all Defendants were reckless and/or grossly negligent in their course of conduct. As a direct, proximate, and foreseeable result of the aforementioned reckless or grossly negligent conduct of the Defendants, the Plaintiff Steven Helfrich suffered and continues to suffer severe emotional distress." (R. 4, at ¶¶ 41-42). Defendants allege that Kentucky does not recognize an independent cause of action for the negligent infliction of emotional distress claim. Helfrich does not offer any response to the merits of Defendants' contention. Accordingly, the Court concludes that Helfrich has abandoned this claim, and Defendants' motion should be granted as to this claim.

Second, an intentional infliction of emotional distress, or "outrage" claim requires a plaintiff to prove:

(1)    the wrongdoer's conduct must be intentional or reckless;
(2)    the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
(3)    there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
(4)    the emotional distress must be severe.

*Kroger Co. v. Wilgruber*, 920 S.W.2d 61, 65 (Ky. 1996) (citing *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984)).

Helfrich's intentional infliction claim fails because the record does not contain evidence that he suffered severe emotional distress as a result of the tasing. According to the record, Helfrich testified that the event "triggered" him into a depression, that he spent a couple of days in bed, and that he was embarrassed to see his family. (*See* R. 53, at 153-54). Furthermore, Helfrich continued to work and testified that he only saw his psychiatrist once regarding this incident. (R. 53, at 8).

Helfrich's distress cannot be considered "severe" under Kentucky law. *See Burgess v. Taylor*, 44 S.W.3d 806, 811 (Ky. Ct. App. 2001) (holding that panic attacks, depression uncured by medication or therapy, and thoughts of suicide requiring medical care constituted severe emotional distress); *Wilgruber*, 920 S.W.2d at 66 (holding that Plaintiff suffered "real and disabling depression" which constituted severe distress). Because Helfrich has failed to demonstrate that he has suffered severe emotional distress, his intentional infliction of emotional distress claim fails as a matter of law. Therefore, Defendants' motion should be granted as to Helfrich's intentional infliction claim.

## 2.    Claims Against the LPCHPA

Finally, Defendants seek summary judgment as to the negligent supervision and training claims. The state law tort of negligent supervision or training requires a plaintiff to establish that an employer's "failure to exercise ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a third person." *Arnold v. Wilder*, Civ. No. 3:04-cv-649-S, 2006 WL 3457216, at *5 (W.D. Ky. Nov. 27, 2006) (quoting *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 441 (Ky. Ct. App.1998). Because Helfrich fails to offer any proof to demonstrate that the LPCHPA did not properly train or supervise Rodriguez, his claims fail, and Defendants' Motion for Summary Judgment as to these claims should be granted.

As noted in the discussion regarding Helfrich's § 1983 municipal liability claim, the record does not reflect that Rodriguez was negligently trained or supervised. In fact, it directly contradicts such an assertion, as Rodriguez received training in the areas of arrest, force, and in use of a taser. (*See* R. 52, at 13-14). Furthermore, Helfrich fails to offer any evidence that Rodriguez was not adequately supervised. Again, the record demonstrates that the LPCHPA had a policy of investigating all incidents involving use of force, and in this case, Sergeant Bihl immediately responded to the call and investigated Rodriguez's use of the taser. Therefore, the record reflects that Rodriguez was both adequately trained and supervised, and Helfrich fails to provide any evidence to show otherwise. Therefore, Helfrich's claim must fail, and Defendants' motion as to this claim should be granted. As these theories of liability against LPCHPA fail, so too does any claim of respondeat superior liability against it for acts of Defendant Rodriguez in his official capacity.

## IV. CONCLUSION AND RECOMMENDATION

For the reasons stated herein, **IT IS RECOMMENDED** that:

(1)     Helfrich's Motion for Partial Summary Judgment (R. 34) be **denied**;

(2)     Defendants' Motion for Summary Judgment (R. 36) be **granted** as to the § 1983 claim of false arrest based upon the disorderly conduct charge, the § 1983 municipal liability claim, state law claims of negligent and intentional infliction of emotional distress, and the state law claims against the LPCHPA, with the LPCHPA being dismissed as a party to this proceeding; and,

(3)     Defendants' Motion for Summary Judgment (R. 36) be **denied** as to the § 1983 claim of false arrest based upon the charges other than the disorderly conduct charge, the § 1983 excessive force claim, and the state law claims of assault and battery.

Particularized objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service or further appeal is waived. Fed. R. Civ. P. 72(b)(2); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985). A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection. *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991)). Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal. *Howard*, 932 F.2d at 509. A party may respond to another's objections within 14 days of being served with those objections. Fed. R. Civ. P. 72(b)(2).

Dated this 18th day of August, 2010.



**Signed By:**

**_Candace J. Smith_**

**United States Magistrate Judge**